We have one case on the calendar this morning, based on an emergency motion. Mylan Institutional v. Aurobindo Pharma, 2017-1645, Mr. Patel. Good morning, Your Honor. Please, please approach the specter. Before you begin, and please don't run the clock yet, I want to ask you, several of your submissions were rejected. Why is it so difficult to comply with our rules? Your Honor, we apologize for that. I think it was one of our team's first couple of filings. Okay, well, please proceed. May it please the Court, Your Honors, thank you for scheduling this hearing on an expedited basis. Your Honors, this is not a hatch-waxman case. Both Mylan and Aurobindo make generic versions of the branded isosulfan blue product that had been approved by the FDA since 1982. Apicor obtained three patents on certain aspects of isosulfan blue. Two patents, the 992 and 616, are directed to a process for making isosulfan blue. And the third patent, the 050 patent, which we call the purity patent, is directed to a claim that is a 99% pure version of isosulfan blue. Well, let me ask you about that. It's really a compound patent. Wasn't there a long-felt need in commercial success with respect to this product? Predecessors had gone out of business. There were shortages. And here, this nearly pure, 99% plus pure compound was obtained. Why don't we uphold the preliminary injunction as that being likely valid? Your Honor, there was no long-felt but unmet need. Let me start with that. The lymphoceryn product was approved in 1982. In the record, there's only evidence of one time period of shortage, which was in the 2006 time frame. And that was when Allied Chemical, the supplier for the API for isosulfan blue, went out of business. It's undisputed that for over 29 years, the market was satisfied with lymphoceryn product, and it was found to be safe and efficacious. And when it was withdrawn, it was not withdrawn for any safety or efficacy reasons. It was just a business decision that was made by the covidian at the time. So with respect to long-felt but unmet need, in terms of shortages, we have to look at the whole history of that 30-year period in which lymphoceryn was sold, and not just focus on that 2005 time period where there was a business reason for a supply shortage. There's no evidence in the record that that shortage was a result of some problem with the prior art process. Secondly, in terms of a long-felt but unmet need, it's clear. The prior art process didn't yield a virtually pure product. Impurity is always important in administering a drug to a human. The prior art process did result in a sufficiently pure product that was approved by the FDA. And critically, myelin, as a generic version, as a generic substitute, does not claim any advantage or benefit or market it for any benefit over the lymphoceryn product. It looks like the marketplace, though, dictated otherwise, right? I mean, once the 99% pure isosulfone was developed, then the market went for that. The market, it was not for the 99%. The market didn't have any knowledge of the 99%, meaning the hospitals, customers. If you look all the way down the chain, myelin markets its product as being equivalent. And in fact, on its website, it provides lymphoceryn data for safety and efficacy. So the market shifted to myelin as is typical when a generic product comes out because of price reasons. The pricing was much—myelin priced it lower, and therefore the market accepted the myelin product. There's no evidence that it was— You say that this is not a Hatch-Waxman case. Who are you both copying? And whose NDA are you both working from, or did you each supply your own? That's a good question. The NDA holder was a company named Covidian that had— Initially, it was Hirsch Industries who developed the product in 1982, and Covidian was the NDA holder. When myelin filed its ANDA, it had to show that it was bioequivalent to the lymphoceryn product. And in 2012, I believe, when Covidian left the market, myelin's product, because no other lymphoceryn product was on the market, it was listed as the reference-listed drug product that if any other generic company wanted to make a generic version, they had to use data from the myelin ISB product. So, your honors, we believe that the long-felt but unmet need, there was none that was satisfied by myelin's ISB product that wasn't already satisfied by lymphoceryn. And the district court abused its discretion and made at least three clear errors that we would like to talk about today. We believe there are a number of other errors. The first error was in reading out the causal nexus requirement, finding it largely irrelevant for FDA-approved products and so-called simple products. The second error is that it clearly erred in finding infringement under the doctrine of equivalence, despite uncontroverted evidence that Orobindo's different process using manganese dioxide and an acid performs in a substantially different way and gets a substantially different result, whether you look at it in purity or in yield. What was the different result? Didn't it yield pure product? I'm sorry. Didn't they both yield pure product? So why was there a different result? So the different result, your honor, you have to look at what Orobindo did, is that it used a conventional preparative HPLC step to get up to the 99%. So the oxidation reaction... Was that HPL step used to get to the pure product or to verify that it was pure? The HPLC is used to get to the pure product. I thought that was crystallization. No, the crystallization is performed and then Orobindo uses preparative HPLC to further purify it to 99%. Pre-crystallization, Orobindo gets 94% pure product. So that's your argument for a different way. One of the arguments for a different way, and that's similar to the Netzer versus Shell case, where the facts were very similar and Shell was using the conventional purification process to get to the claimed purity level. The other different way is that manganese dioxide is a strong oxidant, and the proof is in the pudding. But the claims don't claim any type of limitation dealing with the strength of oxidization, correct? That is absolutely correct. Then why does it matter? We believe that the district court erred in citing intendus. The intendus case stands for the exact opposite position in that you can, when you're looking at the different way, you have to look at the different chemical properties of the compound to see how a person of wording skill in the art would understand whether or not it's operating in a different way. So even though it's not part of the claim, one would have to look at how strong is it, how is it reacting, and does it provide a different result? And the judge was right on page 24 when he said that if it was a strong oxidant, one would expect a different result. And he made a mistake. He looked at the yield in the Oro Pinto Indian patent application, assuming that that was representative of our product. But that is not. You have to look at our ANDA submission, which shows that we only have yield of 88%. And when you look at the correct metric, which is purity, which is what these patents are trying to achieve, we get 94% after the oxidation step and then have to use a conventional preparative HPLC to get it up to 99%. So there was a clear error in the finding of doctrinal equivalence on the 992 and 616 patents. Does the doctrinal equivalence have a different application in the chemical field as opposed to, let's say, mechanical or other fields? Your Honor, my understanding is the doctrinal equivalence is the same, regardless of the field of technology. The Supreme Court in Warren and Jenkinson has held that whether you look at it from insubstantial differences or function, way, or result, it's warned parties not to get caught up in the semantics of the two. Function, way, result is really just a tool for determining whether or not there are insubstantial differences. And in this case, we focused on function, way, and result because it was a better tool to look at what exactly, what is the function that's being played by these various steps. Do you know the structures of aspirin and ibuprofen? Not off the top of my head, Your Honor. Most chemists would consider them very different in structure. Hardly equivalent, but they operate, do the same function in the same way to give the same result. So that's perhaps why the Supreme Court said that it is sometimes difficult to apply FWR in a chemical context. Yes, in that case, you're right. They do have the same function, way, result, but structurally they're very different. One may find that there are still substantial differences between aspirin and ibuprofen. How about if the differences are marked, I mean, just very clear? Isn't silver oxide and manganese dioxide come from different elements on the table of elements? Yes, absolutely, Your Honor. Right off, don't you start with the notion that we're dealing with something that's substantially different? We would agree with that. That is substantially different, and there's no dispute here that we don't literally infringe. We designed around this process using a different oxidation agent that functions in a different environment as well. Manganese dioxide only oxidizes with acid, and the patentee during prosecution distinguished the prior processes that used acid and said that the use of silver oxide without acid was one of the things that allowed it to get to this. If you prevail on this doctrine of equivalence argument, the preliminary injunction still needs to be affirmed unless we also are willing to agree with you on the validity of the 050. Is that right? On the 050 or on the causal nexus piece, the causal nexus piece runs across all three patents for the word. If the court finds that the causal nexus requirement was not met... But one of your problems with your causal nexus argument is throughout, you seem to think the causal nexus has to be to the novel features as opposed to the patented features. It's like you want... I don't know. I feel like this is the week where people want us to return to the gist or the heart of the invention idea, that you all want every doctrine to be tied to some identification of novelty as opposed to the patent claim limitations itself. And I just don't think that is consistent with our law or makes any good sense. Your Honor, I disagree. I believe that the Amble v. Samson line of cases and others, when it's talking about the... I have some degree of familiarity with them. I don't think they stand for that proposition. I think that one should look at the novel features to see if it's driving the demand. Otherwise, consumers really are buying it because it's a generic substitute of lymphosorin, for no other reason than it's a generic substitute of lymphosorin. Finally, Your Honor, with respect to the 050 patent, I think I'm in my rebuttal time. We believe that the district court erred in... even after finding that there is no difference in degree, he found that the claim could still not be obvious because a process to go from 95% to 99% could be patentable. But as the court knows, that claim is just a compound claim. It has no process limitations. We will give you your three minutes of rebuttal back. Ms. Stafford. Good morning. My name is Nicole Stafford, and I represent or am speaking on behalf of Milan Institutional and APICOR this morning. Your Honors, I would like to first focus on some new arguments that were raised by Aurobindo in their appeal, specifically raised in the reply, since APICOR and Milan did not have an opportunity to provide a rebuttal to those. Now, in challenging the district court's factual finding under doctrinal equivalence, Aurobindo claims that after analyzing only the function of manganese dioxide in Aurobindo's process, that is to act as the oxidizing agent, the district court concluded that Aurobindo's process infringes by equivalence. As an initial matter, Aurobindo's non-infringement positions throughout the PI briefing and appeal have been shifting. To be clear, Aurobindo's technical expert only testified in his declaration that silver oxide and manganese dioxide have different functions under the function way result test. But look, they are substantially different, aren't they? Manganese works with acid, and silver doesn't need acid. They're in different groups of the periodic table. One has a plus four valence oxidation state, and one is plus one. Why aren't those substantially different, and therefore not equivalent, at least for preliminary injunction purposes? Well, I believe that they are only insubstantially different, because they form the same function in the same way to achieve substantially the same result. Some of these arguments... But I'm just asking, there are really two possible ways of looking at equivalence, FWR and in substantiality, the differences. And I'm asking why they aren't substantially different for the reasons I outlined. Well, we believe that they are only insubstantially different. They both serve the same function. The arguments with respect to the valence state and them being in different groups of the elemental table, that wasn't raised below by appellants. The idea that you can't use silver oxide with an acid, if you look at the actual testimony from Dr. Sesler that they're citing, I think it's APPX 7334 or 333, it doesn't say that. It says you wouldn't use silver oxide with 60% sulfuric acid, because that would be hazardous. The very next page at APPX 7334, Dr. Sesler goes on to talk about how a mild acid, like phosphoric acid, is totally consistent. The claims themselves do not disclaim the use of acid. They do not. They, in fact, call for a polar solid. Water with acid is a polar solid. So the idea that acid and aqueous solutions with acid are not part of the claims, they are literally part of the claims. The claims are also comprising claims, so they're open to other elements. There would be no question that if they were using silver dioxide with water and acid,  Why didn't the court err in saying there was no disclaimer over Colcani? Your inventor said, the use by applicants of silver oxide without acid is significantly different from the use in Colcani of sulfuric acid. Why wasn't that a disclaimer of a process of using acid? And, of course, they're using acid with manganese. Because the actual nature of the distinction was the use of hazardous toxic oxidants. So Colcani, which is a prior art, the unrefuted testimony is that it's not prior art, but the Colcani reference uses a chromate, which is incredibly toxic. It also uses sulfuric, 60% sulfuric acid, which is toxic and hazardous to work with. Those were the distinctions. There was no limitation that was required to be added to the claims to disclaim the use of a mild acid. Mild acid, like phosphoric acid, was the buffer that's actually used when you inject lymphazurin into the body. So the idea that you couldn't use even a mild acid doesn't make any sense, particularly in the context where the claims require a polar solvent. And water and acid is definitely a polar solvent. Also, with respect to this argument that manganese dioxide can't be used without acid, that is empirically disproven by their own DMF. So if you look at APPX 4626 and APPX 4627, these are their initial studies where they're trying to model and swap in manganese dioxide for the claimed silver oxide. The third entry from the bottom on APPX 4626 shows that it is— or 4726—shows that the results with a pH of 2 to 3 in manganese dioxide, if you go to the very next page, the table at the top of that page, shows the results for manganese oxide just in water with no indication that the pH is adjusted, which is what an organic chemist would understand to be not in acid. All of these raised factual questions. So why was the preliminary injunction justified? It was justified because we established that they had not raised— They said the opposite of you in several of those cases. But the district court made those determinations. And so he's the fact finder with respect to the granting of a preliminary injunction. In other words, there's no genuine issue of material fact? Actually, I don't believe there is. Tell us—defend the holding of the grant of the injunction on the purified compound patent. Well, there's no question— Because after all, it was a 95% pure prior art, right? And so those still in the art have tools to purify and get rid of the remaining 5% impurity. So why wasn't that obvious? Because you couldn't do it. So the Hirsch reference that's dated in 1982, it talks about how it reached apparently a 94.5% purity level by HPLC. But it said the remaining 5.5% were closely related isomers. We know from all the documents that were produced that they were never able to get a higher purity product because they couldn't separate out the— Was the HPLC used to purify it or to verify that it was pure? It can be used both ways. But when they're used differently, it's different. So just because you can separate something and determine— But in this case, my impression was that HPLC was used to verify. In the claims, it is. And it was used in the Hirsch reference to verify. However, I would contend that it was disputed as to whether or not the lymphocene was actually as pure as 94.5% because there was the Hirsch letter to FDA where they indicated the purity was much, much lower. And they asked for help from FDA so that they could identify the impurities and make it pure. And we know that there was a motivation to make a pure blue dye from the 1970s. And yet nobody was able to do it. And it was because nobody until the apicor inventors recognized that it was the nature of the oxidation step and the oxidants used and the fact that you were obtaining your isosulfan blue in a particular mixture. That mixture was—you could purify it. And you could get the other impurities out. Now, with respect to lymphocene, that was not the case because it had closely related isomers. Things like preparative HPLC don't work well if you're talking about separating closely related isomers because they're going to travel at a similar speed through the columns. Now, just because you can quantitatively determine the purity of something via analytical HPLC doesn't mean that you can separate the ingredients and get one that's pure from the other. So, for example, there are mathematical models that would allow you, if you have two peaks that closely overlap, you could do an integration under the curve and you can determine, yes, it's 94% this peak and 5% this peak, but you will never get enough separation to be able to actually use preparative HPLC to separate those out. Now, with respect to their purity levels and this argument that the ethyl impurity means that they had over-oxidation, that's new. That was totally brand new in their recovery. That was never argued. In fact, their expert did not rely upon their ANDA or their DMF process in reaching his opinions. He relied on textbooks. The undisputed evidence is that the strength of oxidation and the way that something is going to function in a particular process is going to vary based on pH, reactants, temperature, and other conditions, including molar equivalents. They use right between two and three molar equivalents at 2.5 of manganese dioxide, which is the claims of the 992 patent. And so this idea that they have desethyl, meaning that they have over-oxidation, is just not supported. Also, if you go look at the appendix page that they cite, that their expert member cited, at APPX 4628, I believe, it does not describe this desethyl impurity as being an over-oxidized impurity. Now, with respect to the actual purity patents themselves, they literally infringe. They never presented to the district court below specific combinations of prior art. Their expert gave a list of 11 references. Plus, that's not on appeal here, only validity for the compound. Exactly, exactly. And I don't believe that they've shown that they've raised a substantial question of validity with respect to the impurity patents. The district court found copying. The district court found praise of others by Aurobindo. The district court found commercial success. They never contested any of those things. The district court also found unexpected results, which they didn't contest, and found a long-felt-but-unmet need, which they contested, but we agree with the district court and we disagree with theirs, with their analysis. There wasn't just one shortage. There were shortages. The opponent says Covidien dropped out for business reasons. In other words, there wasn't a long-felt need. Well, that's just not true. There was a long-felt need since Hiranaka in 1975 to try to characterize and purify these blue dyes. That was also evidenced in a 1982 Hirsch publication as well as in Hirsch Industries' letter to FDA dated 1990 where they said our purity is much lower. We need special permission to release a batch of this material so that there's not a shortage, and we need FDA's help to determine what the impurities are and determine how to get rid of them. And yet despite all of that motivation and desire, there was never a pure isosulfan blue product until Apicor's invention. So do you agree that... Is it correct that Mylan is operating on Covidien's or Hirsch's NDA and that they were simply allowed to do it by the FDA, anyone who can meet the specs? Well, I mean, we relied upon lymphozerin as the reference list of drugs for bioequivalence purposes, but we're not to the same specifications. I think their specifications were like 80% purity. Mylan institutional and Apicor specifications required greater than 99% purity. So do Aurobindo's. If really there was no concern about the purity, why didn't Aurobindo make lymphozerin? Why didn't they make the 90% pure? Why did they instead go after the 99% purity even though they knew about our claims? We had informed them before the lawsuit about this, and they were aware of the 992 patent and its related application with the purity claims. That's copying is the best form of flattery. One thing I'm still confused about, certainly purity is an incredibly important component of all of this, and what you argue was the basis of the commercial success and the success of the patent and for obviousness purposes and everything. But for DOE, their product results in a far less pure form of ISB, and they argue it doesn't work without acid, and that's what they argued below in response to the R&R by the magistrate. They argued it in their blue brief. They argued it in a gray brief, and today you came in and you start making some argument about the lack of a reference to pH in something. I didn't see that argument in your red brief, and I don't even understand it, and you started by saying, well, any chemist would know, and maybe Judge Lori understood whatever the heck you were talking about, but I sure didn't, and I didn't see that argument in your red brief. So maybe you should take a minute and either tell me where it is or explain it to me better, because I'm a little concerned maybe you didn't raise any of those arguments because I only understood your red brief. I didn't understand your red brief to say it doesn't need to have an absence of acid or it needs to have acid. I understood you'd be making a very different argument, so I don't know how to get around this based on the arguments you made in your red brief, and I kind of think the ones you made today are different from what are in your red brief. But I'll be the first one to admit this technology is complex. Maybe I'm missing something, so take a few minutes and try to explain it to me. Sure. Well, some of the arguments were responding to new arguments in Armavendo's reply. There was no new argument in their reply with regard to whether or not the oxidation process would not work without an acid. That's something they raised all the way throughout. That's blue brief page 26. It was in response to the R&R below. So that's not a new argument. So your new citation of lack of pH reference, which I don't even understand, is not in your red brief despite the fact that this acid argument was in their blue brief. Well, the evidence below that the district court accepted was that silver oxide can be used with a mild acid. Did the district court make a fact finding to that extent? I never saw it anywhere. Is there a district court fact finding that I need to give deference to about that? No, there's not. With respect to the purity on their product versus our product in the process, this comparison they're making in their reply brief is brand new, and it is comparing apples and oranges. They're comparing the Hirsch purity of 94.5%, which is after all the possible purification that Hirsch could do to their crude and saying, well, our crude only has a purity of like 89% or 90%. Well, the patent talks about and teaches, the asserted patents teach that you obtain a crude isosulfan blue product from oxidation, but that you then go on and you purify it to the greater than 99% purity, and the invention is the understanding that it's the oxidation step, and it's the nature of the mixture that the isosulfan blue is present in that allows you to obtain something that can be purified to 99%, and so the comparison should be the Orobindo product after the crude isosulfan blue has undergone a purification with the patent claims with Hirsch and the other prior art that was never, never able to obtain that level of purification. I think I've used up my time. Do you have any other questions? Thank you, counsel. Mr. Patel has three minutes for rebuttal if he needs it. Your Honors, there's nothing in the record that shows that Hirsch was trying to achieve greater purity than what was required for a pharmaceutical grade ISB product. In the Hirsch article, he just did analytical HPLC and identified and was clearly able to identify that 94.5% of the mixture that he got was ISB, and the other 5.5% was closely related impurities. There were prior art references that we presented at the lower court such as Snyder and DeHaan that would teach a person of ordinary skill in the art that if you're analytically able to separate out the peaks of the two components, that one could use preparative HPLC to then collect out a purified compound. So we believe that there was a prima facie case of obviousness made at the district court level based on the prior art of Hirsch and Snyder and DeHaan which went so far as to say that and taught a person of ordinary skill in the art to use chromatography for vital dyes such as isosulfan blue. The other issue is that in terms of trying to get to 99% purity, when Hirsch filed his application in 1982, the key factor here is that the FDA did approve his product as being safe and effective for lymphatic mapping. There was no need in that 25 period that anybody knows of for a pure version of lymphazurin. It was a safe and effective product. And if Mylan indeed developed something better, they could have filed an NDA for a better version of lymphazurin. But they didn't do that. They filed a copycat, a generic... They went through the ANDA route, just like us. So there is no difference in that sense. You're a copycat too, right? Yes, we are. We are a... Two copycats. Your Honor, going back to the 050 patent, so there's two lines of invalidity. One, based on the prior... So you want us to disregard that 4 or 5% delta, correct? To copy that delta. The 4 or 5% delta... First, we didn't copy that delta. We set that parameter well before the 050 patent had even issued. So that was in 2012. And even if it is copying, even if we did copy it, the Apple v. Samsung cases hold that copying alone is not sufficient to establish causal nexus. And it's what this court has held that especially in the Hans Waxman context for products that need to be bioequivalent, copying is a much less probative factor. Your Honor, I think I'm running out of time, so we respectfully request that in view of all of the legal and factual errors that were made at the district court level, that this court vacate the preliminary injunction, and we humbly request that it do it in an expedited basis because the injunction is in place and recall has been put into effect. In other words, in reviewing the district court decision, you want us not to be a copycat. That's correct. Thank you. The case will be taken under advisement. All rise. Your Honor, court is adjourned.